Filed 3/28/22  In re R.L. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re R.L., a Person Coming Under the Juvenile Court Law. | C094112 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.Q.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD239785) |

J.Q., mother of minor R.L. (mother), appeals from the juvenile court's order terminating her parental rights and freeing the minor for adoption.[1]  (Welf. & Inst. Code,

---

[1]  The juvenile court also ordered that R.L.'s three siblings be placed in a guardianship, but those orders are not at issue in this appeal.

1

§ 366.26.)[2]  Mother contends the juvenile court erred when it found the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and the sibling exception (§ 366.26, subd. (c)(1)(B)(v)) to adoption did not apply.  She also argues respondent Sacramento County Department of Child, Family and Adult Services (Department) failed to comply with section 16002 by placing R.L. in a foster home separate from her siblings.

We conclude mother forfeited her challenge under section 16002 by failing to object on that basis below, and that the juvenile court properly terminated mother's parental rights and found that no exception to the preferred plan of adoption applied.  We shall affirm the juvenile court's orders.

## BACKGROUND

Mother has four children, Jir.Q., Y.L., N.L., and R.L.,[3] with two different fathers, Brian L. and Bradly C.[4]  Brian L. (father), the presumed father of Y.L., N.L., and R.L., and mother (sometimes collectively referred to as the parents) had an on-again, off-again relationship.  Mother has a long history of referrals to Child Protective Services (CPS) concerning her care of the children.

At the beginning of April 2019, the Department received a report that N.L. had two large purple bruises on her upper arm areas, but she said she did not know how she got the bruises.  A social worker interviewed N.L. at school, and N.L. reported that she lived with both her parents and that they disciplined her by "time out whooping's [*sic*]" with a computer cord; they also struck her siblings with the computer cord, although not

---

[2]  Further undesignated statutory references are to the Welfare and Institutions Code.

[3]  When the petition was filed in 2019, Jir.Q. was nine years old, Y.L. was seven years old, N.L. was six years old, and R.L. was two years old.

[4]  Brian L. was declared the presumed father of Y.L., N.L., and R.L.  Bradly C. was found to be the adjudicated and biological father of Jir.Q.  Neither Brian L. nor Bradly C. is a party to this appeal.

as often. During a body check, the social worker observed light purple, linear marks covering N.L.'s upper arms, as well as multiple healing, linear marks on N.L.'s back, torso, and shoulder blades.

Y.L. similarly confirmed that he was "whooped" when he got in trouble, but he did not want to disclose who "whooped" him or what was used. He told the social worker he was not allowed to tell anyone how he was disciplined at home. Y.L. later disclosed that his parents hit him with their hands, but that they more often used a cord for discipline. His father had slapped him in the face a few times the day before because he had been sent home from school for misbehavior. During a body check, the social worker observed healing, linear marks on Y.L.'s back, which Y.L. reported were from being hit with the cord, although he said he did not remember who hit him.

Jir.Q. is autistic and attempts to interview her were unsuccessful. The social worker observed no bruises or marks on Jir.Q. Because R.L. was only two years old at the time and lacked verbal skills, the social worker also did not interview her.

The social worker spoke with father when he picked up the children from school. Father denied knowing about the bruises or marks, and claimed that the children often fought with one another so they might have gotten the bruises then. He acknowledged that he had disciplined the children with a belt, but he denied leaving marks or bruises. According to father, the children lived primarily with mother in a separate household.

Mother, however, reported that father was the children's main caregiver and that they lived mostly with him in a separate household. She had visits with the children approximately one weekend a month. Mother denied knowing about the bruising or marks on N.L. and Y.L., and she denied ever hitting the children. According to mother, all of the children injure themselves or attack each other, which may have caused the bruises.

All four children were taken into protective custody on April 9, 2019, and both mother and father were issued citations and released for misdemeanor child

3

endangerment (Pen. Code, § 273).  A medical exam conducted the following day revealed that Jir.Q. had marks on her arms and back.  Y.L. had dark, long marks on each of his thighs of unknown origin.  N.L. had multiple loop cord marks on her back and possibly upper arms that were consistent with physical abuse.  Severe behavioral problems were also noted with recommendations for assessment and treatment.[5]

On April 11, 2019, the Department filed a section 300 petition on behalf of the children alleging excessive physical abuse against N.L. and Y.L. in that each had been beaten with a computer cord on several occasions and that the other two children were at risk for physical abuse as well (§ 300, subds. (a), (b)(1)).  It further alleged that both mother and father failed to provide adequate care, protection, and supervision, or engaged in excessive corporal punishment of the children, and neither provided explanations for the children's bruising that were consistent with the type of bruises sustained by the children (§ 300, subds. (a), (b)(1)).

An April 2019 detention report recommended that the children be detained in out-of-home foster care given the parents' use of excessive punishment resulting in physical injuries.  R.L. was placed in a different foster home than her three siblings, although the Department continued its efforts to place all four children together.  According to the report, there were no relatives to consider for placement at that time.  The juvenile court subsequently detained the children and ordered visitation for the parents a minimum of two visits per week.

A May 2019 jurisdiction/disposition report recommended a short continuance to gather additional collateral contact information in order to provide an assessment as to jurisdiction.  At that point, R.L. was still placed in a different foster home than her siblings because the home with the three other children was not able to take all four

_____

[5]  N.L. was later diagnosed with oppositional defiance disorder.  Jir.Q. had autism, and Y.L. was diagnosed with global development delay.

4

siblings, and visitation between R.L. and her siblings was pending. The report noted that the social worker had made efforts to identify, locate, notice, and assess the children's relatives for placement, including interviewing the children in an age appropriate manner regarding their relatives, interviewing the parents, obtaining information regarding the children's relatives, reviewing the case file for further relative information, and telephoning, e-mailing, or visiting identified relatives, including the paternal grandmother.

According to the report, in a second interview, mother denied all knowledge of any physical abuse and claimed she never abused her children, but agreed with the allegation that father had used excessive corporal punishment on the children as their primary caregiver. Mother declined to answer most of the social worker's questions regarding her upbringing, education, employment, mental health, and past child welfare history. She wished to receive services in order to reunite with her children, and wanted the three older children to be placed in the same foster home as R.L., as she believed R.L. was being taken care of but N.L., Y.L., and Jir.Q. were not. Mother reported that there were no other relatives or friends that could be assessed for placement.

In a second interview, father again admitted hitting the children with a belt but denied using a computer cord to discipline them. Father said mother did not discipline the children and did not engage in excessive corporal punishment. Father accused N.L. of lying.

When asked to describe her relationship with mother during a subsequent interview on May 3, 2019, N.L., who was in first grade, reported that she usually watched television with mother, and that mother was good at driving. N.L. said she fought a lot with her brother, and that she was the one who primarily changed R.L.'s diapers. When she was at home, N.L. said that she watched herself or else her siblings would watch her. She initially did not answer when asked if she felt safe at home with mother or father, but later stated that she felt scared at home, and was "really scared" if she ever did anything

5

wrong because she would get "whooped" with a large computer cord by both mother and father when she got in trouble.

Y.L. reported he did not like his foster placement and wanted to return home. He reaffirmed getting "whooped" "[w]ith a cord" when he got in trouble, but refused to state if both mother and father hit him with the cord.

A June 2019 first addendum report and attached proposed findings recommended that the juvenile court sustain the petition.[6] The report further recommended that based on the prior reports, there was clear and convincing evidence that there was a substantial danger to the children's well-being, or would be if they were returned home to mother, and that there were no reasonable means to protect them without removing the children from mother's physical custody. Given mother's extensive history with CPS for which she had already received services, there was an increased future risk of abuse or neglect of the children. The children's developmental delays and severe behavior issues also increased their risk for further harm.[7] The Department recommended the court declare the children dependents of the court, remove them from the parents' custody, and provide reunification services to the parents.

A psychologist and a physician who examined the children both noted that they were extremely fearful of father and, to a lesser extent, mother. Jir.Q., Y.L., and N.L.

---

[6] A second addendum report filed two days later provided the court with proposed updated dispositional findings and orders as to R.L., N.L., and Y.L. The proposed findings included that R.L.'s placement was necessary and appropriate, that the Department had made diligent efforts to place the siblings together, and the Department had assessed the impact of R.L.'s sibling relationship on her placement and planning for legal permanence.

[7] The report noted that although R.L. spoke "a lot," "99.9% of it [was] incoherent." Her caregiver reported that R.L.'s language was "a lot of gibberish." An assessment identified concerns with R.L.'s development, as she did not measure within normal limits in areas of communication, fine motor skills, and problem solving.

remained in one foster home, while R.L., the youngest, remained in a different foster home. As of June 14, 2019, mother had only visited the older children one time, and R.L. one time, since they were detained. Mother refused to cooperate with social workers and she was unresponsive to the children's school, which hindered the Department's ability to complete an individualized education plan (IEP) for each of the older children.

In a third addendum report filed June 25, 2019, the Department reported that mother had e-mailed the Department complaining that she had not seen her eldest three children since April 9, 2019, and that the entire sibling set had not seen each other since April 15, 2019. In response, the social worker e-mailed mother that she had not seen the children because she had been absent, and that the children visited with each other twice per month.

Mother's lack of engagement in visitation was concerning, and she sometimes failed to contact the Department ahead of time if running late, which resulted in visits being terminated. When she did call, she lied about being only a few minutes away when in reality she was 30 to 45 minutes away. Mother failed to show as promised at the children's school to sign necessary paperwork for their IEP's, and although she claimed she was participating in services, the social worker had been unable to verify what services because mother did not return her calls and would not schedule a time to meet in person.

Father told the social worker to let mother have the children because he had enough kids. He refused to discuss the case plan and failed to contact the family service worker to set up visits with the children.

The third addendum contained proposed findings that again found R.L.'s placement was necessary and appropriate, that the Department had made diligent efforts to place the siblings together, that the Department had assessed the impact of R.L.'s sibling relationships on her placement and planning for legal permanence, that it would

7

be beneficial to maintain contact between the siblings, and that R.L. had an appropriate visitation schedule with her siblings.

In August 2019, the Department filed a fourth addendum report,[8] and a fifth addendum report updating the juvenile court on the case. According to the fifth addendum report, mother had visited R.L. six times, on April 18, 25, 26, and May 1, 3, and 8. Since May 8, however, mother either refused to participate in visitation with R.L. or arrived 25 to 45 minutes late for visits resulting in their cancellation. On July 2, 2019, mother arrived at the social worker's office unannounced to discuss why the social worker had not authorized unsupervised visits. After reviewing the visitation policy with mother, the social worker explained why the visits had not progressed to being unsupervised and discussed ways mother could begin improving her visitation. The report noted that mother did not visit with the three older children and continued to make excuses for why she could not visit. The three older children visited with R.L. twice a month at a local park and the visits were going well.

Following a contested jurisdiction/disposition hearing on August 28, 2019, the court found the petition allegations true and sustained the petition as to each child. After admitting the Department's multiple reports into evidence, the court adjudged the children dependents of the court, removed them from the parents' custody, and ordered that reunification services be provided to mother and father. Among other things, the court found that R.L.'s placement was necessary and appropriate, the Department had made diligent efforts to place all of the siblings together, that the Department had assessed the impact of the children's sibling relationship on the children's placement and planning for legal permanence, that it would be beneficial to maintain contact between

---

[8] The fourth addendum report reclassified the proposed jurisdiction and disposition findings and orders to group the children together according to their respective fathers. The proposed findings as to R.L. remained the same.

the children through visitation, and that the children had an appropriate visitation schedule with their siblings.[9]

As of November 2019, mother had completed a parenting education program, but had failed to provide the Department with her pre- and postexamination results, as requested, in order to assess if she benefited from the service. She had attended six out of 12 general group counseling sessions, in which she actively participated, and after some difficulties with scheduling, she had scheduled an appointment for a mental health assessment. Overall, mother was participating in the majority of court-ordered services.

Mother also had visited with the children on a regular basis. She was sometimes aggressive with the visitation monitors and other times engaged in inappropriate behaviors, such as leaving R.L. diaperless, throwing the diaper in the corner, and telling the visitation monitor to "deal with it" when she allowed the child to remain diaperless. She also sometimes interrogated the children about their placement. However, mother was doing better in visits and currently visited all four children one time per week for two hours. Due to a placement change for R.L., mother missed several visits with her, which were to be made up.

By December 2019, mother had completed her mental health assessment but the results were not yet available. The caregivers for the three older children expressed interest in providing a permanent plan for them should reunification efforts fail, but they did not have the room or the resources to care for R.L. R.L.'s foster placement likewise was open to providing a permanent plan for R.L., but did not have the ability to take Jir.Q., N.L., and Y.L. The Department continued to look for any families willing and

---

[9] Mother appealed the juvenile court's jurisdiction and disposition orders. On appeal, mother challenged only the court's visitation order, and we found she had forfeited the issue by failing to object to the visitation order below; we affirmed the juvenile court's orders. (*In re R.L.* (C090589, Jan. 29, 2021) [nonpub. opn.].)

able to care for all four children, but noted that finding such a family would be difficult given the children's high level of special needs.

R.L.'s foster parent reported that R.L. engaged in defiant and self-harming behaviors, such as pulling her hair out and throwing her body around in a tantrum, after visiting with mother. The foster parent was also growing frustrated with mother's constant false allegations of physical abuse that mother made after almost every visit.

At that point, there were numerous concerns about mother's visits. The family service worker who supervised visits reported that the visits had been very difficult; mother often "railroad[ed]" the visits and got very upset if the family service worker gave her any feedback. Mother probed the children about being abused and searched their bodies for marks to make allegations against the foster families; she forced the children to make up elaborate stories by feeding them ideas on what could have given them any marks found, including that they had been drugged, beaten, and choked. The family service worker reported that she had not seen any significant marks on the children that would indicate possible abuse, and all investigations into mother's accusations were determined to be unfounded. The foster parents, who had been foster parents for nearly 20 years, had never experienced anything similar to mother's antics and they were not sure how much longer they would be able to provide a placement for the children if they continued to be investigated for abuse after almost every weekly visit. Both foster families voiced similar concerns and were contemplating giving notice to remove the children from their homes.

In January 2020, the Department reported that mother's mental health assessment diagnosed her for mental health services for perpetrating child abuse and recommended individual psychotherapy services using a dialectical behavior approach to gain emotion regulation and distress tolerance skills to support her parenting capacity. After a child family team meeting on January 3, the caregivers for Jir.Q., Y.L., and N.L. gave a 14-day notice to change placement because they no longer felt equipped to manage the troubling

10

behaviors of all three children, especially after mother's constant abuse allegations and investigations, which were disruptive and overwhelming for the foster family. At the conclusion of the meeting, it was agreed that the caregivers would continue to care for Jir.Q. and Y.L., but that they would no longer care for N.L.

At a second child family team meeting on January 7, 2020, mother confirmed she understood the rules of visits, and the family service worker reported that her visits had greatly improved over the last several weeks. Mother understood that once she had two months of positive visits, she would move to observed visitation, and then visitation would be assessed and adjusted as appropriate. Mother agreed to utilize service providers and the Department social worker for support and to help her make positive progress.

At a placement and progress hearing on January 10, 2020, the court read and considered the Department's progress reports. The court confirmed a six-month permanency review hearing (§ 366.21, subd. (e)) for February 7, 2020.

Prior to the hearing, the Department filed a prepermanency review report, recommending that mother receive an additional six months of family reunification services and that the children remain in out-of-home placement. As of April 14, 2019, Y.L. and Jir.Q. were placed together in the same foster home with a foster father, foster mother, and their biological children; the foster parents were interested in adopting Y.L. and Jir.Q. As of October 18, 2019, R.L. had been placed in a concurrent foster home with a foster mother as well as her granddaughter, and the foster mother was interested in adopting R.L. On January 10, 2020, N.L. was placed in a new concurrent foster home that included three other adoptive daughters. The Department found it was not appropriate at that time to place all of the children back together given their extreme behaviors.

R.L. had speech and social development delays, and she was only able to say a few words, some of which were incomprehensible. She was happy and well adjusted to

11

her foster mother, but often impulsively hit other children in the foster home and showed signs of past distress and traumas for which she was receiving behavioral therapy.

N.L. had been diagnosed with attention deficit hyperactivity disorder and disruptive mood dysregulation disorder, and had increasingly violent and defiant behaviors; she had been referred for more intensive WRAP services. The family service worker refused to transport N.L. to school because N.L. posed a danger to the family service workers who transported her. Although taking prescribed Ritalin daily, N.L. continued to have very difficult behaviors, including a lot of physical and verbal aggression.

Y.L. had speech and language impairments and was often suspended from school for extremely defiant and aggressive behaviors. His caregiver reported that he began to stabilize when mother was not visiting consistently, but as her visits became more consistent his problematic behaviors intensified.

Jir.Q. was well adjusted to her current foster home and did not present any behavioral issues, although her foster parent reported her to be emotionally fragile with periodic screaming and crying. Due to her autism, she had to be monitored and redirected and needed help clothing herself.

While mother had completed the ordered parenting class and general counseling program and actively participated in the general counseling sessions, her therapist was concerned that mother hid some aspects of her case and used her cellphone excessively during the sessions. Starting in February 2020, mother was scheduled to attend individual counseling with the same therapist.

It was reported that mother's visits had "drastically improved" as of December 2019. She had stopped falsely accusing the foster families of abusing and drugging the children and had stopped interrogating the children during the visits. At a child family team meeting, mother alleged that the three older children were being denied their religious rights as Muslims and requested that they be moved to a Muslim foster home.

12

She could not articulate her religious practices, however, and later admitted that she lied about being Muslim.

The court considered the prepermanency review report at the six-month review hearing on February 7, 2020, continued the children as dependents of the court, and found that returning them to mother's care at that time would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being. The court found mother had made fair progress toward alleviating or mitigating the causes necessitating placement, and that although the Department had made diligent efforts to place the children together, it was not then appropriate to do so. The court continued reunification services for mother and confirmed progress report hearings and a permanency review hearing in May and June of 2020, respectively.

In a May 2020 progress report, the Department did not yet recommend returning the children to mother because she had not been able to move to more liberal and unsupervised visits before COVID-19 emergency orders went into effect. Given the history of physical abuse and the issues mother initially had during visits, the Department believed mother still needed to show she could visit the children without any issues to demonstrate that she could provide a safe environment for the children. Mother had completed individual counseling, and her progress toward the treatment goal of increasing her parenting and life management skills was considered good.

A 12-month review hearing was set for June 12, 2020. Prior to the hearing, the Department filed a permanency report, recommending that the children remain dependents, and that the court terminate reunification services for mother and set a section 366.26 hearing with a permanent plan of adoption. The attached proposed findings again stated that R.L.'s placement was appropriate, that the Department had made diligent efforts to place the children together, and that there was an appropriate sibling visitation schedule.

13

Y.L. and Jir.Q. remained in the same foster home, which was able to provide a permanent plan for them should reunification fail, but given space and behavior issues, could not provide a home for R.L. and N.L. They were each doing well in the home. R.L. and N.L. were in two different foster homes, which were both open to providing a permanent plan for each respective child. R.L. was extremely attached to her foster mother and her granddaughter who also lived in the house, and N.L. was doing well in her foster home. Given the children's extreme behaviors and special needs, the Department still found it inappropriate to place the siblings together. The respective caregivers were providing stable, loving, and enriching environments, and were willing to ensure the siblings remained in contact with one another.

It was reported that mother had consistently lied during the reporting period and had been deceptive with service providers. For example, mother continued to tell Turning Point staff, where she received housing assistance, that the children were coming home soon in an attempt to avoid being downsized to a one-bedroom home since she no longer had custody of the children. After being evicted from her four-bedroom home through Turning Point, mother lied to a potential landlord in a different rental. As of the end of May 2020, mother was homeless and living out of her car.

According to mother's therapist, her individual therapy went "ok," but mother needed more therapy to address the issues that brought the children before the court. Mother was not willing to discuss these issues during therapy sessions and would become defensive or change the subject. Mother refused to admit to, or take accountability for, the physical or emotional abuse the children suffered, and the therapist felt she was not honest at all about her part in the children's removal. Instead, the therapist believed mother attended the therapy sessions with the ulterior motive of maintaining her housing or to appease the court rather than to actually work on the physical and emotional abuse issues. Mother, in the therapist's opinion, did not benefit from the sessions because she was unwilling to fully participate in counseling; she attended only to remain in her

14

current home and to protect her livelihood with the benefits that came from having the children in her care. Mother needed more help and at least 10 more sessions of individual therapy to address the issues and to make more progress before the children could safely be returned to her care.

Mother had also made slow progress with her visits, and the family service worker did not recommend that mother move to unsupervised visits at that time. Mother would often call in late to telephonic visits and sometimes would miss them altogether because she forgot.[10] The children's caregivers ensured the children had ongoing contact with each other as often as possible.

A reunification assessment determined the risk of reunifying the children with mother was high given mother's refusal to acknowledge the reasons why the children were removed. Mother had also failed to consistently demonstrate long-lasting behavioral change to mitigate any concerns. When asked what she learned from the parenting program, mother said she did not learn anything new and that the course was commonsense. Because each of the four children had special needs, they required extraordinary supervision and parenting, which the Department believed mother was unable to provide. Mother still did not have a stable living environment, as she was homeless and living in her car.

At a hearing on June 12, 2020, the court considered the reports, and mother requested a contested permanency review hearing. The court set the matter for a pretrial permanency review hearing on July 10, 2020. (§ 366.21, subd. (f).)

In July 2020, the Department filed a court report addendum, reporting that N.L. said mother demanded the children lie about her abusing them and told the children to say that father was the only one that beat them. N.L. said mother had beaten her with a

---

[10] The visits were changed to telephonic or video visits due to the caregivers or someone in their household being high-risk for COVID-19.

thick cord, which left marks on her body, her entire life. N.L. did not want to live with mother and wanted to be adopted by her current foster mother; she was happy she was no longer being beaten. Mother's therapist again stated that no true progress had been made during their sessions, and she was hesitant to act as mother's therapist for a third time.

Mother requested a contested permanency review hearing (§ 366.21, subd. (f)), and the matter was set for August 27, 2020. In an addendum report, the Department reported that mother's therapist said mother had been punctual and present during her sessions and had consistently expressed how much she loved the children, but never admitted to physically or emotionally harming them. Instead, mother claimed she was merely passive in her relationship with father and allowed him to parent as he saw fit. According to the therapist, mother had not fully accepted responsibility because it could affect her livelihood if she did so.

In another addendum report, the Department clarified that mother did not meet the factors in section 366.21, subdivision (g) to extend services, and that there was not a substantial probability that the children would be returned to her physical custody and safely maintained in the home within any extended time period. Although telephonic visits had been going well, mother's progress had recently started to decline; she called in very late and failed to engage with the children during the visits. She had also missed two virtual visits on May 21 and May 28 because she forgot about the meetings and went shopping. Given recent reports from two of the foster mothers regarding issues with visits and with mother, and concerns expressed by N.L.'s psychiatrist about mother having conversations with N.L. that were not age appropriate, unsupervised visits were not recommended at that time.

At the contested permanency review hearing on August 27, 2020, mother testified that she loved her children and wanted them returned to her custody. At that point, she resided in a two-bedroom home and was currently employed. In the parenting class she completed, she learned the difference between disciplining children and punishing them,

and about the importance of self-care. In counseling, she had learned "radical acceptance" for dealing with her emotions in various situations. Before counseling she might have yelled or used corporal punishment when she got frustrated, but now she would take a break and do self-care to regulate her emotions. While mother admitted that she had hit her children with an extension cord and her hands, and that she had also hit N.L. with a belt, she later said it was irrelevant if she had hit them because the juvenile court had found that she had.

Following the hearing, the court found that there was a substantial risk of detriment if the children were returned to mother and that none of the factors for extending services had been met. Although mother had completed the services specified in her case plan, the court found she had not benefited from those services. Mother's testimony that she had been forthcoming with her therapists about her role in the abuse, in the court's view, was not credible, and the court noted that she had a history of lying throughout the case. The court terminated mother's services and adopted the findings and orders prepared by the Department in the permanency report, including that R.L.'s placement was necessary and appropriate, that the Department had made diligent efforts to place the siblings together, that it was not appropriate to place them together, and that the siblings had an appropriate visitation/interaction schedule. The juvenile court set a selection and implementation hearing under section 366.26 on December 18, 2020.[11]

At a section 366.26 status review hearing on October 2, 2020, mother requested the court return her children to her. In November 2020, mother filed a section 388 petition (JV-180 request to change court order form), requesting that the court vacate the

---

[11] On September 3, 2020, mother filed a notice of intent to file a writ petition challenging the court's findings and orders terminating services and setting a section 366.26 hearing. Mother did not file a writ petition, however, and the case was closed.

17

section 366.26 hearing and return her children to her care under a plan of dependent supervision, or, alternatively, reinstate family reunification services. Mother submitted a letter from her therapist that stated she had continued with therapy and had finally admitted to abusing her children. The court denied mother's section 388 petition, finding that her continued counseling sessions, after not benefiting from two initial rounds of therapy, were insufficient to show that circumstances had changed. The court further found that returning the children to her care would not be in their best interests.

The Department prepared a selection and implementation report in December 2020, recommending that the court terminate parental rights.[12] Although mother had maintained contact through regular visits, the parents did not appear to have a relationship with the children such that terminating parental rights would cause them significant emotional harm. The report found that R.L., Y.L., and N.L. were generally adoptable due to their young age and overall good health and development, and Jir.Q. was specifically adoptable due to her developmental delays and intellectual disability. Both R.L.'s and N.L.'s respective foster placements expressed a commitment to adopt. The foster family caring for Y.L. and Jir.Q., however, was no longer able to commit to a permanent plan of adoption.

Given R.L.'s young age, she was not asked for a statement concerning placement and prospective adoption or legal guardianship. N.L. expressed her desire to be adopted by her current caregiver. Because Y.L. and Jir.Q. were not currently residing in a foster to adopt placement, they were not asked for a statement about placement, adoption, or guardianship.

---

[12] The Department attached proposed findings that again found R.L.'s placement was necessary and appropriate, and that the Department had made diligent efforts to place the siblings together, but that it was not appropriate to place them together.

R.L., who was now four years old, continued to have delays in her speech and social development. She was able to use few words and some of those words were difficult to interpret. Although she did not qualify as having a developmental disability, she had been referred for an educational assessment and special education services.

The Department assessed K.A., a maternal cousin to the children, for possible placement. K.A. had a 15-year-old child whom he had previously adopted, and he expressed a desire to adopt all four children rather than serve as a legal guardian. He reported that he did not have any type of relationship with R.L., the youngest child, but that he had known the three older children, N.L., Y.L., and Jir.Q., since they were born and had often babysat them for mother. He kept the three older children for six months in 2017 when mother was homeless and returned them to her when she obtained housing; he had not had contact with them since that time.

Mother wished for all four children to be placed with K.A. At that time, K.A.'s house was certified for a capacity of two, but he expressed a willingness to move to a larger home to allow all of the children to be placed in his care. The Department recommended that Y.L. and Jir.Q. be placed with K.A., but that R.L. and N.L. remain with their respective foster families since those families expressed a commitment to adopt them.

Counsel for the children filed a pretrial statement in January 2021, disagreeing with the Department's recommendation to terminate mother's parental rights to all of the children, and objecting to the proposed findings that R.L. was generally adoptable, since she had developmental delays, and that Jir.Q. was specifically adoptable, since she had not yet been placed in a concurrent home. Counsel argued terminating mother's parental rights would substantially interfere with the children's sibling relationship (§ 366.26, subd. (c)(1)(B)(v)), and that they had a beneficial parental relationship with mother. Counsel informed the court that both N.L. and Y.L. wanted to maintain contact with mother and to continue to visit with her, with visits hopefully progressing to being in

19

person again. Because the children had regular and consistent visits with each other, even though they were not all placed together, and shared common experiences together and with mother, counsel argued ongoing contact between the siblings was in all of their best interests.

The Department filed an addendum to the selection and implementation report on January 21, 2021, updating the court on mother's visitation, placement changes, and case plan. Mother had been approved for weekly observed visits and she was consistent with the visitation schedule. In January 2021, mother began to have two-hour in-person visits twice a month with all four children. While earlier mother had to be redirected to not discuss the case and plans to return the children home, lately her interactions with the children during visits were positive and she appeared appropriate during more recent visits. In the Department's view, it would not be detrimental for the children to be adopted separately. Given the children's special needs and the level of care required for each child, it was not possible to place them all in the same home. Each of the respective caregivers were open to maintaining the sibling relationship after adoption.

At a hearing on February 5, 2021, the court requested an additional addendum with updated information on visitation and an analysis of whether the sibling bond exception applied. The children's counsel also requested that the Department interview them on their positions for the permanent plan. At the request of the children's counsel, the court made findings that the children's placement was necessary and appropriate, and that the Department had complied with the case plan. Mother did not object. The contested selection and implementation hearing was continued to March and then April 2021.

The Department filed an addendum in March, reporting that the social worker observed a sibling visit that mother was not able to attend on February 16, 2021. The children's attention was very short with one another and they appeared to prefer playing independently instead of together. Jir.Q. was not able to participate with her siblings, and

20

both she and Y.L. appeared frustrated at times. The visit ended earlier than planned, and all the children easily transitioned from the visiting area to the car.

During in-home interviews, N.L. reported that she wanted to live with her siblings instead of remaining in her current placement, and also asked to live with K.A. and her siblings. Y.L. wanted to live with "cousin [K.A.]," his current caregiver, and also said he wanted to live with N.L.; Y.L. did not mention R.L. and when asked about living with her, Y.L. said he did not know. Jir.Q. nodded "yes" that she wanted to live with her siblings and also that she wanted to see "mommie." The social worker did not interview R.L. given her young age.

Each caregiver reported that the children did not ask about each other, nor did they request contact with their siblings between visits. Although he initially indicated he wanted to adopt all four children, K.A. was now committed to a plan of legal guardianship; he wished to maintain the relationship of "cousin" rather than "parent." R.L.'s caregiver preferred adoption over legal guardianship as the caregiver was concerned mother would continue to believe she had the right to make decisions regarding R.L. Mother had called her confidential number several times demanding to speak with R.L. At that point, R.L. had been with the caregiver for 16 months without disruption, and the caregiver was willing to support R.L.'s relationship with her siblings.

The Department recommended that Jir.Q., N.L., and Y.L. be placed together in K.A.'s home with a permanent plan of legal guardianship, and that the court terminate mother's parental rights to R.L. and proceed with a permanent plan of adoption.

In an April 2021 addendum, the Department reported that N.L.'s caregiver gave a verbal notice to change placement based on N.L.'s ongoing verbally and physically aggressive behavior towards other children in the home. After 14 days, N.L.'s caregiver said N.L. had to be removed due to her negative behaviors and mother's threats following a recent visit. When N.L. returned from the visit with mother, she was defiant to her caregiver and told her mother said N.L. did not have to listen to the caregiver. On

21

April 18, 2021, N.L. was placed in a concurrent home pending approval of a nonrelative extended family member, S.T., who expressed a willingness to provide a placement for her if approved. While N.L. wanted to live with K.A., who was caring for her siblings Y.L. and Jir.Q., K.A. expressed that he did not wish to have additional children in his home given the children's special needs, and K.A. did not have the capacity for them even after moving to a larger home.

It was further reported that the Department received notification of an open emergency response referral for sexual abuse of Jir.Q. at her previous placement. She was scheduled for a SAFE interview at the end of April 2021.

The contested section 366.26 hearing took place on April 26 and 27, 2021. The Department submitted on the reports and recommended that the court terminate mother's parental rights as to R.L. and set a review hearing (§ 366.3, subd. (d)) for N.L., Y.L., and Jir.Q. while the Department searched for a placement for N.L. and monitored the placement of Y.L. and Jir.Q. with K.A. to ensure it was stable. Counsel for the children did not support adoption as a permanent plan for R.L. at that time because she believed exceptions to the preference for adoption applied.

The children's counsel called Nathan Porter, a relatively new family service worker who transported the children to and from visits with mother and also observed them during the visits. Porter testified that Y.L. and N.L. mainly interacted with each other while riding to visits, but both would be nice to R.L.; due to Jir.Q.'s autism, she would mostly watch a tablet and not interact with the other children. R.L. was usually excited for visits. The children seemed happy to see mother, with R.L. and Jir.Q. very excited to see her. The children generally attempted to hug mother to gain her attention, and she hugged all of the children in return.

Typically, mother brought activities for the children during the visits, including electronic devices, slime making materials, games, and coloring books; mother also brought snacks or meals for them, although she did not usually bring healthy snacks. She

would sometimes be actively engaged in the activities, and other times allow the children to play on the electronic devices without much interaction. The majority of the time, Jir.Q. was on her tablet and Y.L. was on an iPhone. N.L. used the electronic devices less than half the time, as did R.L. In Porter's opinion, mother should have interacted with the children more during some of the visits, but she was generally appropriate during visits. On two visits, however, mother failed to notice that Jir.Q. was overeating, which led to the child throwing up after the visits.

R.L. had thrown tantrums when it was time to end two visits, but mother picked her up, tried to soothe her, and put her in the car where Y.L. tried to console her and she eventually calmed down. Mother would often help R.L. with food or activities. Porter described mother as being patient with R.L. He characterized the relationship as more like a mother-daughter relationship than simply a friendly visitor who provided R.L. with things. R.L. typically hugged or kissed mother goodbye at the end of visits.

During a sibling visit around Valentine's Day, the children asked for mother, but, except for Jir.Q., were fine when Porter told them it was only a visit with their siblings. Porter believed the children had a strong bond with one another and a strong bond with mother. Y.L. had a good relationship with R.L., and N.L. had a good relationship with Jir.Q. and R.L. He acknowledged that sometimes Y.L. and N.L. appeared to engage in sibling rivalry, and that Y.L. often got frustrated with Jir.Q.'s autistic behaviors. R.L. also appeared to be bonded with mother; she never appeared afraid of mother, sought mother out during visits, and was happy to see mother. R.L. did not necessarily seek out her siblings' attention, but she did welcome it.

The children's attorney also called K.A. to testify. Y.L. and Jir.Q. currently lived with K.A., and he testified that he had supervised at least four or five visits between mother and all of the children at a park. The children were generally happy and excited to see mother and each other at the park, although Jir.Q. would greet everyone and then keep to herself. Y.L. and N.L. would help R.L. on the play equipment, and they seemed

happy to K.A. R.L. would also ask mother to help put her shoes on. R.L. told her siblings and mother that she loved them, and she told K.A. that she wanted to stay with him. Mother played with the children during the park visits, and sometimes apologized to them for being in foster care. K.A. believed the children loved mother because they talked about her all the time.

K.A. wanted all of the children eventually placed with him, but he did not want them all presently. He wanted to see how he was doing with Y.L. and Jir.Q. before committing to having all the children together, and he told the social worker that he did not want to be rushed into taking all of the children. He knew N.L. had some behavior issues.

Mother had never caused any problems for K.A., and he had never seen her act inappropriately with the children during the visits he supervised. However, at the last visit, mother had yelled at social worker Fareedah Simon in front of N.L. regarding how N.L.'s foster parent was doing her hair. Based on the incident, K.A. testified it was agreed visits would be moved from the park and K.A. would not supervise them for a while. He was also aware that N.L. had to change placements after the incident.

Social worker Simon testified that N.L.'s placement had to be changed because N.L. was physically aggressive with other girls in the home, and also because mother called the caregiver and threatened her. Prior to calling the caregiver, mother yelled at Simon about N.L.'s hair while the children were present during the last visit at the park. According to Simon, K.A. supervised two visits with mother, not four or five, and after the incident when mother yelled at Simon at the park, K.A. said he did not feel comfortable continuing to supervise the children's visits with mother. In rebuttal, K.A. testified that he supervised two visits with mother and then two sibling visits between Y.L., N.L., and Jir.Q.; R.L. was not present during the sibling visits he supervised.

In closing, the Department argued that neither the sibling bond exception, nor the beneficial parental relationship exception applied in R.L.'s case, and that termination of

24

mother's parental rights and adoption would be in R.L.'s best interest. While the Department acknowledged there was some connection between the siblings and mother, R.L. had lived half of her life with her foster family and had flourished in their care, and the benefit of a stable, adoptive home outweighed the benefit of any such bond. The Department argued that R.L. simply viewed the visits as "fun play dates," and the fact that visits went well was insufficient to establish either exception. R.L.'s caregiver also expressed a willingness to allow future sibling contact.

The children's counsel requested the court not terminate mother's parental rights or proceed with adoption for R.L. because the sibling bond and beneficial parental relationship exceptions to termination applied and there was no guarantee R.L.'s caregiver would actually allow future sibling contact. Counsel asked the court to keep the case open under legal guardianship.

Mother's counsel joined in the arguments made by children's counsel that both the sibling bond and beneficial parental relationship exceptions to adoption applied. Counsel further argued that the testimony showed the sibling bond was very "tight," that mother had maintained regular and existing contact, that mother maintained a parental role, and that the children benefited from contact with mother.

After considering the reports and testimony, as well as counsel's arguments, the court found Y.L., N.L., and Jir.Q. were not adoptable and that there was currently no one available for the court to appoint as a legal guardian. It ordered the permanent plan of legal guardianship with the goal of dismissal of dependency at a later date.

As to R.L., the court found her generally adoptable with no known barriers to adoption. The court found that mother maintained visitation with R.L. and occupied a parental role in her life, and that R.L.'s bond with mother and her siblings was more than that of friendly visitors. Nevertheless, the court found that maintaining those relationships did not outweigh the benefit of permanency through adoption. The court noted that R.L. was two and a half years old when removed from mother's care and had

25

spent nearly half her life out of mother's custody. R.L. had never been placed with her siblings since removal and had not shared significant common experiences with her siblings given her young age. R.L. did not ask about her siblings or request to see them outside of regularly scheduled visitation, which happened twice a month, nor was there any evidence that R.L. asked for her mother outside of visitation. R.L. had a healthy attachment to her caregiver, with whom she had been placed for 16 months.

The court declared R.L. a dependent of the court, terminated parental rights, and freed R.L. for adoption. Mother and R.L. timely appealed.[13]

## DISCUSSION

## I

### *Beneficial Parental Relationship Exception to Adoption*

Mother contends the juvenile court erred in failing to find the beneficial parental relationship exception to adoption applied to R.L. She contends the court applied the wrong legal standards in deciding whether she had established the exception, and she requests that we reverse and remand so the juvenile court may apply the correct standards as recently enunciated in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). In supplemental briefing, mother cites several post-*Caden C.* cases to show *Caden C.* was a "game changer" that requires remand for reconsideration of the exception in light of the Supreme Court's decision.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996)

---

[13] R.L.'s appeal was subsequently dismissed pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835.

26

44 Cal.App.4th 1352, 1368.)  The court should decline terminating parental rights only if the parents can establish termination would be detrimental to the child under one of the statutory exceptions.  (*Caden C., supra*, 11 Cal.5th at p. 631 [" '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption' "].)  "In other words, when a parent establishes that one of the exceptions applies, adoption or termination is not 'in the best interest of the child.' " (*Ibid.*)

The beneficial parental relationship exception applies when:  "The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶]  (i) The parents have maintained regular visitation and conduct with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  There are three discrete elements a parent must show by a preponderance of the evidence to establish the exception:  "(1) [R]egular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*Caden C., supra*, 11 Cal.5th at pp. 631; *id.* at pp. 636-637.)

Our Supreme Court recently analyzed this exception in depth in *Caden C.*, published after the juvenile court's section 366.26 ruling here.  The Supreme Court found the first element "straightforward," requiring that the " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632.)  The second element is, as with the entire analysis, focused on the child, and may be shaped by factors such as " 'the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)  "[O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological

importance of the relationship for the child." (*Id.* at pp. 632-633.) Finally, for the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Id.* at p. 633.) Thus, courts in effect consider "what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)

Caden C. clarified that, when deciding whether terminating parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes. (*Caden C., supra*, 11 Cal.5th at p. 634.) "Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*) Thus, a parent's lack of progress in addressing the issues that led to dependency is not determinative, otherwise the exception would never apply. Because a section 366.26 hearing is held when a parent has not been successful in addressing the problems leading to dependency, the exception can only apply "when the parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency." (*Caden C.*, at p. 637.) Inability to address the issues leading to dependency, however, can be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child." (*Ibid.*) But it is only relevant to the extent it informs the central question before the court: "[W]ould the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)

Performing this analysis is a "subtle enterprise." (*Caden C., supra*, 11 Cal.5th at p. 634.) Sometimes, "a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing

28

those burdens along with the benefits of the relationship" (*ibid.*), and a bonding study or other relevant expert testimony may be helpful in determining the importance of the parental relationship for the child. (*Id.* at p. 633, fn. 4.)

The Supreme Court also determined the applicable standard of review for the beneficial parental relationship exception: "[A] substantial evidence standard of review applies to the first two elements," and the third element, given it is a hybrid of factual determinations and discretionary balancing, is "properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at pp. 639, 640.) "But where, as with the parental-benefit exception, 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards.' " (*Id.* at p. 641.) On appeal, we do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Ibid.*)

In this case, mother argues the juvenile court improperly compared her with the foster parents and erroneously added a "compelling reason" element to the beneficial parental relationship exception. We are not persuaded.

The record shows that the juvenile court properly considered the age of R.L., the proportional amount of time she had spent in parental and foster care, the importance of R.L.'s relationship with mother, and the detriment to R.L. of losing that relationship. While the juvenile court ruled before it had the benefit of our Supreme Court's decision in *Caden C.*, we see nothing in the court's analysis that contravenes *Caden C.*, which mother concedes generally accepted the approach adopted by earlier cases such as *In re Autumn H.* (1994) 27 Cal.App.4th 567 and *In re Beatrice M.* (1994) 29 Cal.App.4th 1411. (*Caden C., supra*, 11 Cal.5th at pp. 631-632 [referring to *Autumn H.* as the "seminal decision interpreting the [beneficial parental relationship] exception"].)

*Caden C.* explained that a parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the beneficial parental relationship exception. (*Caden C., supra*, 11 Cal.5th at p. 637.) But the juvenile court here did not

consider mother's efforts, or lack thereof, to complete her case plan or to address any circumstances that gave rise to the dependency case in deciding whether the exception applied.

We also reject mother's claim that the juvenile court improperly compared her with the foster parents. In analyzing the exception, the juvenile court did not compare the parenting abilities of the foster parents with mother's parenting abilities or their respective abilities to provide a home to R.L., and it never concluded that the foster parents "won" any such comparisons. (*Caden C., supra*, 11 Cal.5th at p. 626 [when a juvenile court weighs whether termination would be detrimental it is "not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"].) Instead, the court focused on the quality of mother's relationship with R.L., noting that mother was more than a friendly visitor to R.L., and that their visits were generally positive, but that no evidence showed that R.L. ever asked for mother or her siblings outside of visitation. Recognizing that R.L. had a healthy attachment to her caregiver after living over half her life with the caregiver does not mean the court inappropriately compared mother's and the caregiver's parenting abilities.

Nor did the juvenile court improperly add a "compelling reason" element to the beneficial parental relationship exception as mother argues. Rather, the court expressly stated that the exception "may be applicable where the parent has maintained regular visitation and contact with the child, and the child would benefit from continuing the relationship." The parents, the court noted, bore the burden of showing by a preponderance of the evidence that their relationship with the child promoted the child's well-being to such a degree as to outweigh the well-being the child would gain in a permanent home with new adoptive parents. Thus, the juvenile court properly considered regular contact, a beneficial relationship with mother, and any detriment from losing the relationship, and it did not ever mandate that mother show an additional "compelling reason" before it could find the exception applied. (*Caden C., supra*, 11 Cal.5th at

30

pp. 635-636 [beneficial parental relationship exception itself is a compelling reason not to terminate parental rights].)

Mother's reliance in supplemental briefing on several post-*Caden C.* cases is likewise unavailing. In *In re J.D.* (2021) 70 Cal.App.5th 833, the juvenile court terminated parental rights after making "few explicit factual findings concerning the parental benefit exception." (*Id.* at p. 851.) The appellate court reversed and remanded because it could not be "certain the juvenile court did not consider factors disapproved of in *Caden C.*" (*Id.* at p. 854.) The agency's reports focused on the connection between the caretaker, who was a relative of the mother, and the child, but "such evidence does not preclude a finding [the child] had a significant positive attachment to mother." (*Id.* at p. 859.) Conversely, there was "very little information in its prior reports during the case about the quality of mother's relationship with" the child. (*Id.* at p. 860.) The appellate court found that, though it is not the agency's burden to disprove the beneficial relationship exception, "by the time the juvenile court scheduled the section 366.26 hearing, the agency's prior reports should already have provided objective, disinterested information about the quality of [the child's] attachment to his mother." (*Id.* at p. 861.) In contrast, we have already determined that the juvenile court did not consider factors disapproved of in *Caden C.*

Similarly, *In re D.M.* (2021) 71 Cal.App.5th 261 does not support mother's claim of error. In *D.M.*, the juvenile court terminated the father's parental rights after a brief analysis finding the beneficial parental relationship exception did not apply. (*Id.* at p. 268.) The appellate court reversed and remanded because the juvenile court "said nothing about the attachment between father and his children," instead focusing on the fact that the father's actions had not risen to the level of a parent. (*Id.* at pp. 264, 268, 270-271.) In doing so, the court noted that *Caden C.* made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like. (*Id.* at p. 270.) Unlike

in *D.M.*, the juvenile court here found mother occupied a parental role with R.L., and the court considered the nature of their relationship given R.L.'s young age and how long she had been removed from mother's care in determining whether it would be detrimental to R.L. to permanently sever the relationship.

Finally, mother relies on *In re L.A.-O.* (2021) 73 Cal.App.5th 197 in her supplemental reply brief, which was decided after her initial supplemental opening brief was filed. Based on *L.A.-O.*, mother argues that the juvenile court erred to the extent it required mother to occupy a "parental role" rather than merely have a "beneficial relationship" with R.L. (*Id.* at p. 202.) Even if we assume, without deciding, that the juvenile court should not have considered whether mother occupied a "parental role" with R.L. (but see, *In re A.L.* (2022) 73 Cal.App.5th 1131, 1157 ["in assessing potential detriment, it was proper for the juvenile court to consider whether, and the extent to which, the caregivers and father occupied parental roles with the minor"]), we conclude any alleged error was harmless. The juvenile court found mother occupied a parental role as to R.L., and did not base its determination that the exception did not apply on a lack of any such parental role like the court did in *L.A.-O.*

To the extent mother contends that the social worker reports filed in this case were somehow incomplete or lacking, and that the social worker failed to sufficiently explain the proceedings to the children and ask how they felt about adoption, the record belies her argument. The record is replete with numerous reports and addendums that lay out mother's progress, how mother felt about the children, how the children felt about mother, and also where they wanted to live. The reports explained that given R.L.'s young age and severe communication issues, she was not asked about where she preferred to live, which is reasonable under the circumstances. Contrary to mother's suggestion, the reports are not one sided or only contain information that would urge the court to terminate her parental rights.

We turn next to whether substantial evidence supports the juvenile court's factual findings regarding the first two elements of the beneficial parental relationship exception, and whether the juvenile court abused its discretion in determining it would not be detrimental to R.L. to terminate her relationship with mother. We conclude sufficient evidence supports the juvenile court's findings that mother visited R.L. regularly and that mother shared a positive attachment with R.L. as she was more than a friendly visitor in R.L.'s life. Although mother visited inconsistently at first, her visits became more regular and positive over the course of the dependency proceedings. Furthermore, R.L. was usually excited to see mother and they were affectionate during the visits. Mother helped R.L. with tasks throughout the visits, and, according to K.A., said she loved mother.

Notwithstanding these findings, we further conclude the juvenile court did not abuse its discretion in determining that terminating R.L.'s relationship with mother would not be detrimental to her. As the court noted, R.L. was first removed from mother's custody when she was two and a half years old, and at the time of section 366.26 hearing she was four and a half years old. Given her young age, R.L. had been out of mother's care for half her life and had been in her current foster home for 16 months. No evidence showed R.L. asked for mother outside of visits and she appeared to have a healthy relationship with her caregivers. While R.L. sought guidance from mother during visits and threw two temper tantrums upon leaving visits, which the court found was common for a normal four year old, the tantrums ended before the car ride home and R.L. easily transitioned without incident back to the care of her foster parents. Viewing the evidence in the light most favorable to the juvenile court's order, as mother concedes we must (*Caden C., supra*, 11 Cal.5th at pp. 640-641), we conclude the juvenile court did not abuse its discretion in determining mother failed to show that terminating R.L.'s relationship with her would be detrimental to R.L.

33

## II

### *Sibling Exception to Adoption*

Mother contends the juvenile court erred in failing to apply the exception to adoption based on avoiding interference with a sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) We disagree.

As previously noted, there are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is when termination of parental rights would result in "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

There is a "heavy burden" on the party opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) The authors of the legislation envisioned that the applicability of this exception would " 'likely be rare.' " (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 950.) This language from the legislative history has been interpreted to mean "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption," (*ibid.*) "*particularly when the proceedings concern young children whose needs for a competent, caring, and stable parent are paramount.*" (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014, italics added.)

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 952.) If the court

34

determines that the child has a significant sibling relationship and would suffer detriment if that relationship were severed, the court then must weigh the benefit to the child of continuing the relationship against "the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re L.Y.L.*, at pp. 952-953.) As with the beneficial parental relationship exception to adoption, we do not substitute our judgment for that of the juvenile court as to what is in the child's best interest. (*Caden C., supra*, 11 Cal.5th at p. 641.)

Mother primarily argues that the Department, based on an alleged misinterpretation of *In re L.Y.L., supra*, 101 Cal.App.4th 942, erroneously encouraged the court to consider only the effects of adoption on R.L. and to ignore any detrimental effects on each of her siblings in determining whether the sibling exception applied. She contends the matter must be remanded so the juvenile court can consider the effects of the proposed adoption on Jir.Q., Y.L., and N.L., and to determine whether some sort of decision can be made that protects the interests of all the children rather than just R.L.

But our Supreme Court has already rejected a similar argument in *In re Celine R.* (2003) 31 Cal.4th 45, which involved three siblings, one of whom had been placed in legal guardianship and the other two for whom adoption was recommended. In *Celine R.*, the court considered whether the sibling exception "require[d] the court to consider the interests of all the siblings or only detriment to the specific child in question." (*Id.* at p. 49.) The court held that "the court may reject adoption under this sibling relationship provision only if it finds adoption would be detrimental to the child whose welfare is being considered. It may not prevent a child from being adopted solely because of the effect the adoption may have on a sibling." (*Id.* at pp. 49-50.) Indeed, the court found that "[n]othing in the statute suggests the Legislature intended to permit a court to not choose an adoption that is in the adoptive child's best interest because of the possible effect the adoption may have on a sibling." (*Id.* at p. 54.) While the court acknowledged that a "sibling's relationship with the [adoptive] child is not irrelevant" as

35

it could be indirect evidence of the effect the adoption may have on the adoptive child (*id.* at p. 55), the court emphasized that the ultimate question remained "whether adoption would be detrimental to the adoptive child, not someone else." (*Ibid.*)[14]

Here, the juvenile court properly focused on the effect of severing the sibling relationship on R.L., rather than any incidental effect on Y.L., N.L., and Jir.Q. The record supports the court's finding that while R.L. enjoyed a positive, familial relationship with her siblings, it would not be detrimental for her to sever the relationship. As the court noted, R.L. was only two and a half years old when she was removed from mother's care in April 2019, and she had not lived with her siblings since removal (over half her short life). Given her extremely young age and the fact that she had never been placed with her siblings, she had not shared significant common experiences with her siblings.

R.L.'s caregiver reported that she never asked about her siblings or requested to see them outside regularly scheduled visitation. Other evidence showed that the children preferred playing independently of one another rather than together. R.L. did not necessarily seek out her siblings' attention, but she did welcome it. And while N.L. said she wanted to live with her siblings, Y.L. said he wanted to live with N.L. but never mentioned living with R.L. When specifically asked about living with R.L., Y.L. said he did not know. This evidence shows that while the children may have enjoyed their visits together, they did not share a bond that would outweigh the benefits R.L. would obtain through a permanent adoption. The court did not err in finding the sibling relationship exception did not apply.

---

[14] To the extent mother suggests *Celine R.* was decided in error and that we should not follow it, we reject her argument. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [decisions of California Supreme Court are binding upon and must be followed by all inferior state courts].)

### *Section 16002*

Mother contends the Department violated section 16002 by failing to place all four siblings together in a single foster home.  She concedes she did not raise the issue below, but contends the issue essentially cannot be forfeited.  We disagree.

Section 16002 provides:  "It is the intent of the Legislature to maintain the continuity of the family unit, and ensure the preservation and strengthening of the child's family ties by ensuring that when siblings have been removed from their home, either as a group on one occurrence or individually on separate occurrences, the siblings will be placed together, *unless it has been determined that placement together is contrary to the safety or well-being of any sibling*."  (§ 16022, subd. (a)(1), italics added.)  Under section 16002, subdivision (b), "[t]he responsible local agency shall make a diligent effort in all out-of-home placements of dependent children and wards in foster care, including those with relatives, to place siblings together in the same placement, and to develop and maintain sibling relationships.  If siblings are not placed together in the same home, the social worker or probation officer shall explain why the siblings are not placed together and what efforts the social worker or probation officer is making to place the siblings together *or why making those efforts would be contrary to the safety and well-being of any of the siblings*."  (Italics added.)

In this case, the Department's numerous reports and proposed findings set forth why R.L. could not be placed with her siblings given the various special needs of all four children as well as not being able to find a family willing or able to take all four children.  After multiple hearings, the court found that R.L.'s placement was necessary and appropriate, that the Department had made diligent efforts to place the siblings together, and that it was not appropriate to place the children together.  The court also ordered sibling visits.  In response to a specific request from the children's counsel at a hearing

on February 5, 2021, the court found that R.L.'s placement was necessary and appropriate.

Mother never objected to the separate placements of the children based on section 16002. Nor did she object to the court making the findings that the children could not all be placed together due to their severe behavioral issues and that R.L.'s placement was necessary and appropriate. Although she expressed a desire that the children be placed together early in the case and later that they be placed with K.A., she never objected that either the Department or the court failed to satisfy section 16002 regarding their efforts to place the children together or that the Department failed to provide for visitation amongst the siblings.

A party forfeits the right to claim error as grounds for reversal on appeal when they fail to object in the trial court as mother did here. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501-502.) The purpose of this rule is to encourage parties to bring errors to the attention of the trial court so that they may be corrected. (*Ibid.*) Dependency matters are not exempt from the forfeiture rule. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 961-962.) Because dependency proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance, and an appellate court's discretion to excuse forfeiture should only be exercised rarely. (*In re S.B.*, at p. 1293.) We decline to exercise such discretion to excuse mother's forfeiture here.

Nor are we persuaded that an objection based on section 16002 below would have been futile. Mother's reliance on *In re Valerie A., supra*, 152 Cal.App.4th 987 to establish a futility exception to the general forfeiture rule is unavailing. The juvenile court in *Valerie A.* had previously made an erroneous ruling that the children at issue there were *not* siblings so the appellate court found that a request for a sibling visitation

order would have been futile.  (*Id.* at p. 1001.)  Here, by contrast, the juvenile court never erroneously ruled that any of the children were not siblings.

## DISPOSITION

The orders of the juvenile court terminating mother's parental rights and freeing R.L. for adoption are affirmed.

      /s/                
RAYE, P. J.

We concur:


     /s/              
HULL, J.


     /s/              
KRAUSE, J.